UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR-06-38-B-W |
| ) | |
| PATRICK BOUTOT, ) | |
| ) | |
| Defendant. ) | |

### SENTENCING ORDER

A diagnosed schizophrenic, Patrick Boutot attempted to possess a firearm as a direct result of his diminished mental capacity and is entitled to a downward departure under U.S.S.G. § 5K2.13. Further, as the Bureau of Prisons refused to pre-designate the facility where he will be incarcerated or even, after sentencing, to consider the Court's recommendations as to the appropriate facility, the Court concludes that Mr. Boutot is entitled to a *Koon* departure, based on extreme risks if incarcerated without regard for his need for psychiatric treatment. The Court orders Mr. Boutot incarcerated for two weeks, a period sufficiently short to avoid his potential designation within the general federal prison population and sufficiently long to impress upon him the need to conform his future conduct with the law.

### I. STATEMENT OF FACTS

Patrick Boutot should not possess a firearm. Now thirty years old, he has carried a diagnosis of schizophrenia since 1998. His underlying psychiatric condition is exacerbated by polysubstance dependence, including abuse of marijuana, cocaine, and alcohol, which he uses to self-medicate, occasionally with untoward consequences. Diagnosed as a Mentally Ill Chemical Abuser (MICA), a category of patients particularly problematic for treatment personnel, Mr. Boutot has been psychiatrically hospitalized on numerous occasions. He has been involuntarily

hospitalized at least twice and is therefore prohibited from possessing a firearm under 18 U.S.C. § 922(g)(4).

On January 13, 2006, Mr. Boutot appeared at a local pawnbroker and attempted to purchase a handgun. He later said that he had been hearing voices and that unnamed people were spreading rumors. He thought that if he had a handgun, the rumors would stop, and he admitted he felt better when trying to buy the handgun. Mr. Boutot completed ATF Form 4473 and answered "No" to question 11.f, which asked whether he had previously been involuntarily committed. When later interviewed, Mr. Boutot readily admitted that in answering "no," he had intended to deceive the pawnbroker into completing the sale. On May 10, 2006, a federal grand jury indicted Mr. Boutot for making a false statement on a federal firearms application, a violation of 18 U.S.C. § 922(a)(6). Mr. Boutot has acknowledged from the outset that he violated the law and has been willing to plead guilty.

The Court and the parties have struggled with Mr. Boutot's competence and how it affects the proceedings, including whether he was sufficiently competent to stand trial and assist in his defense and what the proper sentence should be. Mr. Boutot never contended that he was unable to understand that his attempt to purchase the firearm was not only wrong, but also violative of the law. *See* 18 U.S.C. § 4242. The Prosecution Version states that, when interviewed after the offense, he readily "admitted that, by answering no to the question, he had intended to deceive the gun dealer into completing the sale." *Prosecution Version* at 2 (Docket # 38). Further, during his allocution at sentencing, Mr. Boutot volunteered that part of his motivation was to test the system and see if he could get a firearm.

However, Mr. Boutot did question his competency to stand trial. *See* 18 U.S.C. § 4241. On June 28, 2006, the Court granted Mr. Boutot's motion for a competency examination and Mr.

Boutot underwent a thorough evaluation at the Metropolitan Correctional Center in New York City. On August 11, 2006, the examiner concluded that he was competent to stand trial and on September 11, 2006, the Court concurred. Based on Mr. Boutot's continued willingness to plead guilty, the matter was ready for a Rule 11 hearing and the entry of a guilty plea.

This left the question of the appropriate sentence. The parties, with the Court's approval, agreed to have a Presentence Report (PSR) prepared prior to the entry of the guilty plea. The Probation Office completed the PSR on February 6, 2007. It calculated that, with a total offense level of 12 under the United States Sentencing Guidelines, and a criminal history category of I, Mr. Boutot would face a guideline sentencing range of 10 to 16 months, falling within Zone C of the guidelines. For a Zone C sentence, the guidelines would allow Mr. Boutot to serve half of his sentence in community confinement or home detention, "provided that at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d).

## II. DISCUSSION

Mr. Boutot seeks a downward departure under either the aberrant behavior provision, U.S.S.G. § 5K2.20, or the diminished capacity provision, U.S.S.G. § 5K2.13.

### A. Aberrant Behavior – U.S.S.G. § 5K2.20

Under U.S.S.G. § 5K2.20, a court may grant a downward departure for aberrant behavior if a number of conditions are met. U.S.S.G. § 5K2.20. First, the defendant cannot have been convicted of certain enumerated offenses, not applicable here.[1]  Second, a court is allowed to depart downward only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and, (3) represents a marked deviation from an otherwise law-abiding life. *Id.* Finally, the court may

---

[1] The offenses include those involving a minor victim, sex trafficking in children, obscenity, sexual abuse, sexual exploitation of children, or transportation for illegal sexual activity. *See* U.S.S.G. § 5K2.20(a).

3

not depart downward under this section if the offense involved serious bodily injury or death, the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon, the conviction was for a serious drug offense, or the defendant had more than one criminal history point or any other serious criminal behavior. *Id.*

The aberrant behavior provision does not quite fit. Mr. Boutot meets most, but not all the aberrant behavior criteria. *United States v. Rivera-Rodriguez*, 318 F.3d 268, 275 (1st Cir. 2003) ("[T]he defendant must meet all of the express qualifications in application note 1 . . . and not be excluded by any of the express exclusions in the guideline itself . . .").[2] Mr. Boutot's offense is not one where the downward departure is unavailable under one of the categorical exclusions in U.S.S.G. § 5K2.20(c)(1)-(3). He does not have more than one criminal history point or a prior federal or state felony conviction. U.S.S.G. § 5K2.20(c)(4). The offense was committed without significant planning and was of limited duration. U.S.S.G. § 5K2.20(b)(1)-(2).

The problem is that the offense does not represent a "marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b)(3). Consistent with his MICA diagnosis, Mr. Boutot frankly admitted extensive and prolonged use of illegal drugs, including heroin, cocaine, LSD, mushrooms, oxycodone, and marijuana, and the Court cannot conclude that a person who has routinely violated federal and state drug laws is leading an "otherwise law abiding life." Because the Court cannot conclude that the instant offense represents a marked deviation by Mr. Boutot from an otherwise law-abiding life, he is not entitled to an aberrant behavior departure under U.S.S.G. § 5K2.20.

---

[2] Until 2002, the first application note under U.S.S.G. §5K2.20 simply contained the three definitional requirements for aberrant behavior. The 2003 version of the guidelines reflects the current amended version, in which the requirements are outlined in § 5K2.20(b). The version of the guidelines the sentencing court applied in *Rivera-Rodriguez* contained the three requirements in the first application note.

**B.  Diminished Capacity – U.S.S.G. § 5K2.13**

The diminished capacity downward departure is a different story.  It allows for a downward departure if the defendant "committed the offense while suffering from a significantly reduced mental capacity" and the "significantly reduced mental capacity contributed substantially to the commission of the offense."  U.S.S.G. § 5K2.13.[3]  The Court does not hesitate in finding that Mr. Boutot was suffering from a significantly reduced mental capacity at the time he committed the instant offense.  He attempted to purchase the firearm because he was hearing voices, the voices were telling him about rumors, and he thought that if he got a gun, the rumors would stop.  He actually felt better when he was in the process of purchasing the firearm.  Delusions and hallucinations are symptoms consistent with his diagnosis of schizophrenia and at the time of the offense, Mr. Boutot was not only suffering from these symptoms, but these symptoms contributed substantially to his commission of the offense.  *See United States v. Ruklick*, 919 F.2d 95, 98 (8th Cir. 1990) (applying U.S.S.G. § 5K2.13 to a defendant with schizophrenia when his diminished capacity "comprised a contributing factor in the commission of the offense."); *United States v. Lauzon*, 938 F.2d 326, 330-31 (1st Cir. 1991) (quoting *Ruklick* with approval and applying § 5K2.13 to a defendant who was borderline mentally retarded).[4]

---

[3] The application note to § 5K2.13 defines "significantly reduced mental capacity" to mean that "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

[4] The First Circuit expanded on its holding:

> We agree that § 5K2.13 does not require that reduced mental capacity be the "but-for" or "sole" cause of the offense. The key words of the section are: "a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense. . . ." This means, as we interpret it, that the reduced mental capacity of a defendant must have contributed to *some* extent to the commission of the offense.

*United States v. Lauzon*, 938 F.2d 326, 331 (1st Cir. 1991) (emphasis in original).

There are, however, restrictions on the availability of a diminished capacity downward departure. The provision is unavailable to defendants whose reduced mental capacity was caused by the "voluntary use of drugs or other intoxicants." U.S.S.G. § 5K2.13. Here, because of Mr. Boutot's history and diagnosis, the Court has carefully reviewed his counseling notes surrounding the day he committed this crime. They reveal that he had not been using illegal drugs or alcohol for approximately two months. The January 3, 2006 note states: "Said he has not used illicit drugs or alcohol in 2 months" and the January 10, 2006 note reads: "[H]e states he . . . has not used illicit drugs in 65 days. Adds 'I've been enjoying sobriety so much.'" Neither these records nor other evidence establishes that Mr. Boutot's use of illegal drugs or alcohol caused or contributed to the commission of this offense.

With the possible exception for the need to protect the public, none of the other restrictions under the guideline applies.[5] The guideline prohibits a downward departure if "the facts and circumstances of the . . . offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." U.S.S.G. § 5K2.13. There is no evidence of "actual violence" in this case and, therefore, the narrow question is whether Mr. Boutot's attempted purchase represented a "serious threat of violence" so as to disqualify him from the diminished capacity downward departure.

This is a difficult question. In enacting the Gun Control Act, Congress "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). This prohibition included individuals "not legally entitled to possess [firearms] because of . . . incompetency." *Id.* at 220 (quoting S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968)). Mr. Boutot's conviction is

---

[5] The guideline prohibits a diminished capacity downward departure if "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." U.S.S.G. § 5K2.13. It also bars application if the defendant has committed one of a series of listed crimes. Mr. Boutot does not have any prior convictions.

6

consistent with this underlying policy, but there is no suggestion that, because of his prior involuntary commitment to a mental institution, he is – for that reason alone – disqualified from a § 5K2.13 departure. There are certainly instances where a person previously committed to a mental institution has such a proclivity for violence that he would be prohibited from receiving a § 5K2.13 downward departure, but the application of the departure is case-specific. *See United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) (concluding that a § 5K2.13 downward departure could be available to a defendant who was "anxious, depressed, full of rage, markedly paranoid, and explosive at times.") (internal quotation marks omitted).[6]

Due to his psychiatric condition, Mr. Boutot may have some potential for violence, but despite his extensive hospitalizations and ongoing counseling, there is only a single documented instance of violent behavior. In 2001, he was charged with assaulting his mother with whom he has had a complicated relationship, but he was not convicted. At age thirty, despite his long-term mental illness, he has no convictions and no other charges. After reviewing his psychiatric history and considering the nature of the offense, the Court concludes that Mr. Boutot is entitled to a downward departure for diminished capacity under U.S.S.G. § 5K2.13.

### C. *Koon v. United States* Departure: Extraordinary Vulnerability in Prison

In *Koon v. United States*, the United States Supreme Court concluded that the district court did not abuse its discretion when, in fashioning its sentence, it considered "the extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as police officers, [which] make Koon and Powell unusually susceptible to prison abuse."

---

[6] This conclusion is bolstered by the guideline provisions on the definition of crime of violence. Under the guidelines, the possession or attempted possession of a handgun by a felon does not necessarily constitute a crime of violence. *See* U.S.S.G. § 4B1.2, *App. Note* 1 ("'Crime of violence' does not include the offense of unlawful possession of a firearm by a felon unless the possession was of a firearm described in 26 U.S.C. § 5845(a)."). Even though the guidelines do not directly address whether the possession – or attempted possession – of a firearm by one previously involuntarily committed to a mental institution constitutes a crime of violence, if possession by a felon does not, it follows that possession by a person previously committed to a mental institution does not necessarily constitute a crime of violence either.

7

518 U.S. 81, 112 (1996). In *United States v. Ribot*, Judge Gertner suggested that *Koon* may justify a departure in a case involving a defendant with psychiatric problems who presented "extraordinary vulnerability to abuse in prison." 97 F. Supp. 2d 74, 84 (D. Mass. 1999);[7] *see also United States v. Pineyro*, 372 F. Supp. 2d 133 (D. Mass. 2005).[8]

From the outset, the Government, defense counsel, and the Court have been concerned about the impact that serving a prison term with the general inmate population would have on Mr. Boutot. Mr. Boutot is barely able to cope with life when he takes his prescribed medications, receives supportive counseling, and stays away from illegal drugs and alcohol. Even then, as this case demonstrates, he occasionally decompensates. Here, despite all of these reinforcing factors, Mr. Boutot began to believe that people were accusing him of raping a girl, that these people were persistently spreading these rumors about him, and that if he got a gun, the rumors would stop and he would feel better. In the past, when not adequately monitored, Mr. Boutot has become severely delusional, believing he was working for the CIA, shaving his entire body because he thought he was an Olympic swimmer, believing he exuded a powerful, disagreeable odor, and having what he described as "a spiritual experience" when he saw FBI agents in the desert, who were really angels.

The challenge Mr. Boutot's case presents is striking the appropriate balance between the need to punish the crime and the need not to exact a punishment different in kind and harshness due to his psychiatric condition. If the Bureau of Prisons (BOP) designated Mr. Boutot to serve a sentence with the general inmate population, the Court and the parties are deeply concerned

---

[7] Taking into account all grounds for departure, Judge Gertner departed seven offense levels downward – from 17 to 10. *Ribot*, 97 F. Supp. 2d at 84.

[8] In *Pineyro*, Judge Gertner concluded: "A sentence within the Guidelines range – indeed any sentence of imprisonment beyond what Pineyro has already received – would substantially disrupt an existing, elaborate and required medical treatment plan for Pineyro's [heterotopic ossification], wholly without justification." 372 F. Supp. 2d at 139-40. The Court departed nine levels, and the defendant satisfied his sentence with fifteen months of time served. *Id*. at 140.

that he would fare poorly, would fail to take required medications, would begin to hallucinate or otherwise decompensate, and would suffer through his term of incarceration far more than an inmate without his psychiatric history. On the other hand, if the BOP designated Mr. Boutot to an institution that would attend to his psychiatric needs, there is evidence that he could withstand incarceration.[9]

To make certain that, if Mr. Boutot were incarcerated, the BOP would designate him to a facility appropriate for his psychiatric condition, the Government, upon the Court's urging and with the Defendant's consent, explored with the BOP whether it could give any assurance that Mr. Boutot would be placed in a medical facility or other institution that would monitor his psychiatric condition and maintain treatment. On February 26, 2007, the Government reported discouraging news. Dr. Shelly Stanton, the Acting Director of the BOP Psychiatric Services, frankly stated that the BOP would not provide a pre-sentencing designation, and would not guarantee that he would be designated to a medical facility. She warned that he might be designated to a "traditional penitentiary setting." The Assistant United States Attorney (AUSA) reported that if the Court wished to have Mr. Boutot serve any portion of his sentence in a medical facility, it must "make a recommendation in the Judgment and Commitment that he receive mental health treatment at the appropriate BOP facility." But even if the Court made such a recommendation, the AUSA wrote: "When asked, Dr. Stanton reported that the Court's recommendation that the defendant serve his time at a particular BOP facility, such as Devens, *is not given any consideration*." (emphasis added).[10]

---

[9] For example, Mr. Boutot's prolonged stay at the psychiatric wing of the Metropolitan Correctional Center was uneventful. He kept mostly to himself, took his medication, and was generally cooperative.

[10] Dr. Stanton's statement comes as a surprise. The Court acknowledges the BOP's statutory authority to designate the place of confinement for federal prisoners. *United States v. Guerrette*, 389 F. Supp. 2d 10, 12 (D. Me. 2005); 18 U.S.C. § 3621(b). In doing so, the BOP must factor into its designation decision a host of factors unavailable to the courts. Nevertheless, the statute also directs that, in making the designation, the BOP should consider "any statement by the court that imposed the sentence . . . recommending a type of penal or correctional facility as

9

Furthermore, the AUSA reported that the BOP designation will not take place until six to eight weeks after the imposition of sentence. If remanded immediately after sentencing, Mr. Boutot would likely be incarcerated at a combination of state facilities, where he might or might not receive his prescribed medication and required treatment plan.[11] To allow him to remain on bail during this six to eight week period would be one option, but the impact of a looming federal prison term on Mr. Boutot during this interval would be a separate cause for concern.

The combination of Mr. Boutot's significant underlying schizophrenia, a diagnosis confirmed by the BOP psychologists, and the BOP's unwillingness to pre-designate or even give "any consideration" to the Court's recommendation as to designation leads to the conclusion that Mr. Boutot presents extraordinary grounds for a *Koon* departure, based on the substantial risk of his extreme vulnerability in prison.

### D. Extent of the Departure

#### 1. Section 5K2.13

Under § 5K2.13, the extent of the downward departure "should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." U.S.S.G. § 5K2.13. Here, Mr. Boutot committed this offense because of his diminished capacity, but it is also his diminished capacity that renders his attempted purchase of a firearm an offense in the first place.

---

appropriate . . . ." 18 U.S.C. § 3621(b)(4)(B). Consistent with this provision, sentencing courts will occasionally "make recommendations regarding the type of facility or a specific facility." *United States v. Cintron-Fernandez*, 356 F.3d 340, 345 (1st Cir. 2004). It is clear that a court's recommendations "remain recommendations only," *Guerrette*, 389 F. Supp. 2d at 12, and the BOP is free to do what it deems best. It may be that Dr. Stanton's statement draws a distinction between court recommendations about the "type of facility," which the BOP will consider, and a "specific facility," which it will not. The language in *Cintron-Fernandez*, however, suggests that in the First Circuit, the statute encompasses both. That BOP would not give the sentencing court's recommendation "any consideration," therefore, seems inconsistent with the law in this Circuit. Her statement may not represent official BOP policy, but her candor may reflect actual BOP practice.

[11] What happens to a defendant upon the imposition of sentence, if remanded immediately, remains complicated and uncertain. In this Court, the defendant is usually held locally for a brief period and then transferred to Cumberland County Jail in Portland to await designation. Apparently, some local facilities are better than others in making certain that the defendant receives prescribed medication; upon transfer, it may take some time for the defendant's medication regime to catch up to the defendant.

In view of the interrelationship between his offense and his mental capacity, the Court concludes that his offense level should be reduced four levels from Offense Level 12 to Offense Level 8, placing Mr. Boutot in Zone A.

### 2. *Koon* Departure

The Court arrives at the same result for the *Koon* departure.  A four level reduction will allow the exercise of discretion as to where Mr. Boutot serves his incarceration.  There is commonly a delay as long as six to eight weeks before the BOP designation and, during this time, Mr. Boutot will be held in state of Maine facilities.  Although the Court has no authority to require that Mr. Boutot be held in a particular facility, the parties have suggested that, if Mr. Boutot were incarcerated for not more than two weeks, they would be able to place him in a particular local facility where he would be more likely to have access to his prescribed medications and the chances of a serious psychiatric setback would be diminished.[12]  To achieve the departure consistent with the basis for the departure, the Court departs downward four levels from Offense Level 12 to Offense Level 8, again, placing Mr. Boutot in Zone A.

### 3. A Balance of Unsatisfactory Alternates

The Court's consternation about Mr. Boutot's attempted possession of a firearm is not fully assuaged.  Because the prohibition of the law applied to him precisely because he had been involuntarily committed for a psychiatric illness, it follows that his psychiatric illness cannot grant him immunity from punishment.  Further, Mr. Boutot must be effectively dissuaded from attempting to repeat the conduct that led to his commission of this offense.

The alternatives are unsatisfactory.  Placing him on probation alone would, in the Court's view, be an insufficient penalty to adequately deter Mr. Boutot from similar conduct in the

---

[12] Commonly, if a defendant is ordered to serve a brief period of incarceration, the time is served locally simply to avoid the expense of transfer to a federal prison.

11

future. Placing Mr. Boutot, who struggles with paranoia, on electronic monitoring for an extended period would raise concerns about the impact extended use of an electronic bracelet would have on his underlying schizophrenia. Designating Mr. Boutot to Pharos House, a residential rehabilitation center in Portland would be one alternative, but the Court has no authority to do so.

The last option is imprisonment. As the Court has determined that he is extraordinarily vulnerable to imprisonment, it may seem inconsistent to imprison Mr. Boutot for any period of incarceration. But, Mr. Boutot must receive some punishment for his conduct, if only to impress upon him the absolute necessity of not repeating it. Further, incarceration itself is not necessarily inappropriate for Mr. Boutot; what is inappropriate is incarceration at an institution that does not recognize and accommodate his underlying psychiatric condition.

### III. CONCLUSION

This case points out the limited range of options, due in large part to the BOP's inability to pre-designate a prison facility, and more significantly, its refusal to give any consideration to the Court's recommendations about designation. If the BOP designated Mr. Boutot to a "traditional penitentiary setting" without vigilant monitoring of his psychiatric condition, without intense oversight to assure his regular ingestion of critical psychotropic medication, and without ongoing counseling, the Court concludes that Mr. Boutot would be sentenced to a far more severe term of incarceration than a similarly situated defendant and a far more severe penalty than his crime justifies. Therefore, the Court orders the Defendant to serve a prison sentence of two weeks, a period of incarceration long enough to impress upon Mr. Boutot the need to

conform his future conduct to the requirements of the law and short enough to avoid his custody within the general inmate population of the BOP system.[13]

    SO ORDERED.

                                          /s/ John A. Woodcock, Jr.
                                          JOHN A. WOODCOCK, JR.
                                          UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2007

---

[13] Technically, the term of incarceration is 64 days, since Mr. Boutot is entitled to credit for time served during his court-ordered psychiatric evaluation; in this case, fifty days. In addition to incarceration, the Court is imposing a three year term of supervised release, is mandating continuing mental health treatment, drug and alcohol counseling, and periodic drug and alcohol testing, is imposing a $2,000 fine, and the mandatory $100 special assessment.